**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DAVHON BROWN, a minor, by his father and next friend JAMES BROWN, Jr. | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **Civil Action No. WGC-06-1167** |
| | ) |
| SOUTHERN MANAGEMENT HOLDING CORPORATION | ) ) |
| | ) |
| Defendant. | ) |
| | ) |

**<u>MEMORANDUM OPINION</u>**

Plaintiff, Davhon Brown, a minor, by his father and next friend James Brown, Jr.,

brought this action against Defendant, Southern Management Holding Corporation ("Southern

Management") alleging negligence by Southern Management for improperly installing a window

screen.  While in his parents' bedroom, Davhon Brown fell out of the window four stories to the

ground.  The parties consented to proceed before a United States Magistrate Judge for all further

proceedings in the case and the entry of a final judgment.  *See* Document Nos. 13, 15.  Pending

before the Court and ready for resolution is Defendant Southern Management's Motion for

Summary Judgment (Document No. 62).  Plaintiff filed an Opposition (Document No. 66).

Defendant Southern Management did not file a Reply and the deadline for filing has elapsed.  No

hearing is deemed necessary, and thus Defendant's Request for an Oral Hearing (Document No.

62) is **<u>DENIED</u>**.  The Court now rules pursuant to Local Rule 105.6 (D. Md. 2004).

# I.  **BACKGROUND**

Davhon Brown, along with his parents, James, Jr. and Jennifer Brown and older brother,

Darius began residing at 3390 Curtis Drive, Apartment 302, Suitland, Maryland in April, 2004.[1]

This apartment is part of the Carriage Hill Apartments which are owned and operated by

Southern Management.  Apartment 302 has two bedrooms — a master bedroom occupied by Mr.

and Mrs. Brown and a second bedroom occupied by the children.[2]  In the master bedroom Mr.

Brown installed a window fan on the window ledge of one of the windows.[3]  Mrs. Brown

---

[1] Neither Mr. Brown nor Mrs. Brown entered into a lease with Southern Management to rent Apartment 302.  Mr. Brown's sister, Tawanda Gray, applied for and obtained a lease.  According to that lease the occupants of the apartment are limited to Tawanda Gray, Darius Brown and Davhon Brown.  Mem. P. & A. Supp. Pl.'s Resp. Def.'s Summ J. ("Pl.'s Mem."), Ex. 3 (Jennifer Brown Dep. 19:18 - 20:4).

> Q:  And when you moved into the apartments over at Carriage Hill, did you enter into a lease at that time?
> A:  No.
> Q:  Did your husband?
> A:  No.
> Q:  Any reason why you and your husband didn't apply for a lease at that time?
> A:  He didn't have a job.
> Q:  Okay.
> A:  And I didn't have a job.
> Q:  So what did you all decide to do in terms of getting an apartment?
> A:  What do you mean?
> Q:  How did you go about getting an apartment when you didn't have a job?
> A:  My sister-in-law.  We asked my sister-in-law if she would get an apartment for us until we got a job.
> Q:  Okay.  Who is your sister-in-law?
> A:  Tawanda Gray.
> Q:  Who asked her to get the apartment for you all?
> A:  Me and my husband.
> Q:  And when Ms. Gray applied for the apartment it was 3390, Apartment 302?
> A:  Yes.
> Q:  And the plan was that she would apply for it and you all would live there?
> A:  Yes.

*Id.*., Ex 3 (Jennifer Brown Dep. 12:9 - 13: 17).  *See also id*., Ex. 2 (James Brown, Jr. Dep. 17:13 - 18:4).

[2] Mrs. Brown gave birth to her third son, Dason, in May 2005.  *Id*., Ex. 3 (Jennifer Brown Dep. 43:8 - 14).

[3] Q:  How many windows were in the room?
   A:  You have got your window with the ledge here, left-hand window, left wall window with a ledge, and then you have a panel window, you know, the big windows, glass, and then two smaller ones, but there is only the left wall window that opens up.

confirmed that the window fan sat on the windowsill.  Mem. P. & A. Supp. Pl.'s Resp. Def.'s

Summ. J. ("Pl.'s Mem."), Ex. 3 (Jennifer Brown Dep. 26:13 - 27:4).  According to the Browns

the window fan never touched the screen.  The window was partially closed with the fan.  *Id.*,

Ex. 3 (Jennifer Brown Dep. 23:6 - 7).  According to Mr. Brown, when he and his wife were not

in the bedroom, he kept their bedroom door closed to allow cool air to circulate in the room.

Sometime between July 8-11, 2005, Mr. Brown noticed that the bottom part of the

window screen was sticking out of its hinge or sticking out a little as if bent.  *Id.*, Ex. 2 (James

Brown, Jr. Dep. 33:4 - 12, 51:11 - 52:1).  Upon noticing this problem, Mr. Brown called

Southern Management's maintenance help line.  *Id.*, Ex. 2 (James Brown, Jr. Dep. 58:17 - 21).

On the morning of July 21, 2005, when Mr. Brown left for work, the window fan was in

the bedroom window.  *Id.*, Ex. 2 (James Brown, Jr. Dep. 40:5 - 13).  Sometime after her

husband's departure, Mrs. Brown moved the fan from the bedroom window to the living room.

The window was open almost all the way.[4]  Mrs. Brown moved the window fan to the living

room because the air conditioning was not working.[5]  When Mrs. Brown removed the window

---

*Id.*, Ex. 2 (James Brown, Jr. Dep. 20:14 - 19).  The window fan was installed in the left wall window.

[4]  Q:  And was the window opened or closed?
A:  Opened.
Q:  How far was it open?
A:  Almost all the way.
Q:  Who opened the window almost all the way in the afternoon of the accident?
A:  Me.
Q:  And why did you open it almost all the way?
A:  To see if I could get some air.

*Id.*, Ex. 3 (Jennifer Brown Dep. 47:4 - 12).

[5]  Q:  Who moved the fan from the window to the living room?
A:  I did.
Q:  And when did you do that?
A:  I did it the morning, that morning.
Q:  That morning?

fan from the bedroom, she noticed a corner of the window screen was a little bit out.  *Id.*, Ex. 3 (Jennifer Brown Dep. 33:18 - 34:8).

The door to the master bedroom was open mostly all day long.  During the day, the two older boys played in their bedroom and took a nap.  Also, sometime during the day the boys took a nap with their mother in the master bedroom.

Mrs. Brown served dinner between 5:30 and 6:00 p.m.  She was home alone with the three children.  The children had bathed for the evening.  Shortly before 7:00 p.m., Davhon and Darius were playing a game in their bedroom.  The door to the master bedroom was open.  The window, with the window fan removed, was open almost all the way.  The Browns' queen size bed was positioned close to the window, in a corner of the room.  *Id.*, Ex. 3 (Jennifer Brown Dep. 22:15 - 23:2).  Mrs. Brown was in the kitchen preparing a bottle for the baby.  The baby was in the living room.  Mrs. Brown was unaware that her two older boys, Davhon and Darius, had moved from their bedroom to the parents' bedroom.  *Id.*, Ex. 3 (Jennifer Brown Dep. 50:2: - 13, 54:4 - 15).

Darius told his mother that Davhon fell out of the window.  Mrs. Brown screamed and ran to the window in her bedroom.

When she arrived in her bedroom, Mrs. Brown noticed the screen was partially in the window.  Davhon was on the ground screaming.

---

A:  Yes.
Q:  Had the air conditioning been working generally in the apartment up until the day of the accident?
A:  Yes.
Q:  Was the air conditioning working on the day of the accident?
A:  No.

*Id.*, Ex. 3 (Jennifer Brown Dep. 25:8 - 20).

4

Davhon was flown by helicopter to Children's National Medical Center.  Davhon was hospitalized for seven to eight days.  Davhon's injuries consisted of a broken arm, a broken wrist, a broken leg, and some neck problems.  Davhon was four years old on July 21, 2005.

## II.  <u>STANDARD OF REVIEW</u>

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56( c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrision v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56( c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.  On the other hand, on those issues on which the nonmoving party will have the burden of proof, it is that

party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256. However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. DISCUSSION

To establish a *prima facie* case of negligence, Davhon Brown must prove (1) a duty owed to him by Southern Management, (2) a breach of that duty, (3) causation, and (4) damages. *B.N. v. K.K*, 312 Md. 135, 141, 538 A.2d 1175, 1178 (1988). Under Maryland law children below the age of five are incapable of contributory negligence. *Miller v. Graff*, 196 Md. 609, 620, 78 A.2d 220, 224 (1951).

Regarding premises liability, under Maryland law, a property owner owes a certain duty to an individual who comes in contact with the property, and the scope of the duty owed is dependent upon the individual's status while on the property. *Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 688, 705 A.2d 1144, 1148 (1998). Maryland law recognizes four categories of individuals: (1) an invitee, (2) a licensee by invitation, (3) a bare licensee, and (4) a trespasser. An invitee is an individual who is on the property for a purpose related to the landowner's business. "An occupier of land has a duty to use reasonable and ordinary care to keep the premises safe for an invitee and to protect him from injury caused by an unreasonable

6

risk that the invitee, by exercising ordinary care for his own safety, will not discover." *Henley v. Prince George's County*, 305 Md. 320, 339, 503 A.2d 1333, 1343 (1986). A licensee by invitation is a social guest and the landowner "'owes a duty to exercise reasonable care to warn the guest of dangerous conditions that are known to the [landowner] but not easily discoverable.'" *Flippo*, 348 Md. at 689, 705 A.2d at 1148 (citation omitted). For a bare licensee, a person on the property with permission but for his/her own purposes, a landowner only owes a duty to refrain from willfully and wantonly injuring the bare licensee and to refrain from creating "'new and undisclosed sources of danger without warning the [bare] licensee.'" *Id.* (citation omitted). For a trespasser, someone who intentionally and without permission enters another's property, a landowner owes no duty except refraining from willfully or wantonly injuring or entrapping the trespasser.

In a multi unit residential property, such as an apartment building, a landlord is responsible for maintaining the common areas, such as hallways and stairways, in a reasonably safe condition. *Matthews v. Amberwood Assocs. Ltd. P'ship, Inc.*, 351 Md. 544, 553-54, 719 A.2d 119, 123 (1998). A landlord is not ordinarily liable for injuries to a tenant or a tenant's guest from a hazardous condition within a leased apartment that develops *after* the tenant takes possession of the apartment. *Id.* at 555, 719 A.2d at 124. "As with most general principles of law, however, this principle, that a landlord is not responsible for dangerous conditions in the leased premises, is not absolute and has exceptions. For example, where a landlord agrees to rectify a dangerous condition in the leased premises, and fails to do so, he may be liable for injuries caused by the condition." *Id.*

It is undisputed that Mr. and Mrs. Brown occupied Apartment 302 but were not listed on

the lease as occupants.  *See* Pl.'s Mem., Ex. 2 (James Brown, Jr. Dep. 17:13 - 18:4); Ex. 3

(Jennifer Brown Dep. 15:14 - 16:3, 19:11 - 20:4).  It is further undisputed that Tawanda Gray,

James Brown, Jr.'s sister, obtained a lease from Southern Management to rent Apartment 302

and that Darius Brown and Davhon Brown are identified as occupants on the lease.  *Id.*

Technically, under the Maryland law, Mr. and Mrs. Brown would be classified as trespassers.[6]

However, as an occupant as listed on the lease, Davhon Brown is an invitee.

The next issue to resolve is whether Southern Management breached the duty of care

owed to Davhon Brown.  Southern Management contends it did not breach a duty owed to

Davhon Brown.  Specifically, Southern Management claims it is not obligated to provide screens

to prevent young children from falling out of windows.  According to Southern Management, the

purpose of window screens, as mandated by the Prince George's County Housing Code, is to

prevent insects from entering a residence.

> Based upon my knowledge and experience, as well as my expertise,
> I am familiar with the Housing Code regulations with respect to the
> installation and maintenance of window screens for multi family
> dwellings in Prince George's County as those existed in 2005.

---

[6]    Q:  Did you enter into a lease agreement for 3390 Curtis [D]rive, Apartment 302?
       A:  No, I didn't.
       Q:  Did your wife, Jennifer Brown?
       A:  No.  Only people that was on the lease were my kids.
       Q:  Did you ever notify in writing the landlord that you were actually living in there with your family?
       A:  No.
       Q:  To your knowledge, who was the tenant on the lease?
       A:  My kids and my sister.
       Q:  Okay.  To your knowledge, did you ever advise or did your wife ever advise the landlord that you
       and your wife were actually living in 3390, Apartment 302?
       A:  To my knowledge, no, but then, again, I don't fully recall if I had told my sister to tell them or not.
       Q:  Do you know whether or not your sister, Tawanda Gray advised the landlord that she was moving
       out and that you and your wife were taking over her lease?
       A:  To my knowledge, no.

*Id.*, Ex. 2 (James Brown, Jr., Dep. 17:13 - 18:16).  *See also id.*, Ex. 3 (Jennifer Brown Dep. 15:14 - 16 ) ("Q:  Now,
when you moved in, did you ever tell the landlord that you were living there?  A:  No.").

\*          \*          \*

>    The standard of care at that time did not require the Defendant, or any real estate management company or owner of multi family residential property to have installed screens which prevented young children from falling from windows.

>    The purpose of the Housing Code regulations in Prince George's County as of July, 2005 for window screens was to prevent infestation of insects and/or bugs, not to prevent children from falling from windows.

Mem. P. & A. ("Def.'s Mem."), Landsman[7] Aff., at 2.

Plaintiff argues Defendant's assertion, that Maryland law does not impose on landlords a duty to provide windows screens to prevent children from falling out of windows, is a misstatement of the law. "While the duty of care owed by a landlord to a tenant in Maryland is quite clear, there is no factually identical case imposing or relieving landlords of such a specific duty regarding window screens and children." Pl.'s Mem., at 6. Plaintiff further rejects Defendant's contention that the sole purpose of window screens is to keep insects out, relying on *Gould v. DeBeve*, 330 F.2d 826, 828 (D.C. Cir. 1964) where that court proclaimed, "That the Housing Code may perhaps concern itself only with flies does not define the duties owed to children under the general law of negligence."

Although there is no Maryland case directly on point, the vast majority of jurisdictions, when considering the purpose of window screens in rental units, have concluded the purpose is to keep insects out and not children in. *See Pineda v. Ennabe*, 72 Cal. Rptr. 2d 206, 207 (Cal. Ct. App. 1998) ("The screen was designed and intended to keep out insects, not to prevent

---

[7] Steven G. Landsman has been employed in the real estate management field for over 20 years, has managed multi family residential dwellings in Prince George's County, and has qualified as an expert in the field of multi family property management in the Circuit Court for Prince George's County.

children or others from falling out the window."); *Hussein v. Gabasha*, No. 203650, 1999 Mich.

App. LEXIS 925, at *4 (Mich. Ct. App. May 7, 1999) ("[T]he purpose of a screen is to allow

ventilation while keeping out insects; not to prevent children from falling through windows.");

*Lamkin v. Towner*, 563 N.E.2d 449, 453 (Ill. 1990) ("[T]here is no duty on the part of a landlord

to maintain in any window of an apartment he leases to tenants a screen sufficiently strong to

support the weight of a tenant's minor child leaning against the screen.").  This is confirmed by

Todd Wilson, Southern Management's property manager, who oversees the Carriage Hill

Apartments which includes the apartment building where Davhon Brown resided on July 21,

2005.

> Q:  With regard to the policy during the punchout[8] to check and see if the window screen is properly installed, why is that policy in place?
>
> MR. COSTELLO:   Object.  Go ahead.
>
> A:    Your question in regards to the window screen, why is it installed during the punchout?
>
> Q:   Yes.  Why do you have that policy to check to make sure it's properly installed?
>
> A:    To prevent bugs and things of that nature from entering the apartment.[9]

---

[8] "A punchout addresses every particular room in the apartment, doorknobs, things of that nature."  Pl.'s Mem., Ex. 6 (Wilson Dep. 31:13 - 14).

[9] During his deposition when Mr. Brown was asked, "Why were you concerned about the window [screen] being out of track?"  He responded, "It's just mosquitos, you know, when you have a fan, mosquitos, bugs and stuff."  *Id.*, Ex. 2 (James Brown, Jr. Dep. 57:13 - 14, 19 - 20).  Mr. Brown was likewise concerned that someone could fall through the window because the window screen was partially off track.

> Q:  So were you concerned at all when you saw the screen partially out of the track on the bottom left-hand side that your children would go out that window?
> A:  I even thought I could fall out of it.  I even thought I could possibly fall.

Pl.'s Mem., Ex. 6 (Wilson Dep. 33:10 - 19).  A landlord is "presumed to know the requirements

of the City Code pertaining to the habitability of leased premises." *Benik v. Hatcher*, 358 Md.

507, 532, 750 A.2d 10, 24 (2000).  The Prince George's County Housing Code states in pertinent

part,

> 303.14 Insect screens.  During the period from June 1 to October 15,
> every door, window, and other outside opening required for
> ventilation of habitable rooms, food preparation areas, food services
> areas, or any areas where products to be included or utilized in food
> for human consumption are processed, manufactured, packaged, or
> stored, shall be supplied with approved tightly fitting screens of not
> less than sixteen (16) mesh per inch, and every swinging door shall
> have a self-closing device in good working condition.
>
> Exceptions:
>
> 1.  No screens shall be required on any floor about the fifth
> floor.
> 2.  Screen doors shall not be required where other approved
> means, such as air curtains or inspect repellant fans, are employed.

Prince George's County, Subtitle 13 (Housing & Property Standards), Division 1, Subdivision 2

§ 13-119.

Plaintiff has not presented any evidence contradicting and/or challenging the Prince

George's County Housing Code regarding "insect screens," Todd Wilson's testimony or Steven

Landsman's affidavit.

Where courts have found a duty owed by a landlord, the landlord either explicitly

promised to ensure the window screen would prevent a child from falling through a window,

*Shaw v. Butterworth*, 38 S.W.2d 57 (Mo. 1931) or the child was injured in a *common area* of the

---

*Id.*, Ex. 2 (James Brown, Jr. Dep. 58:1 - 6).

apartment, *Amos v. Alpha Property Management*, 87 Cal. Rptr. 2d 34 (Cal. App. 1999).  Neither one of these circumstances occurred in this case.

Plaintiff contends Southern Management breached its duty by failing to make repairs to the window screen in a sufficient period of time.  Specifically, approximately a week and a half before Davhon's accident, Mr. Brown reported a defect with the window screen to the maintenance office.  Two days later, Mr. Brown told his sister[10] about the problem with the window screen but Mr. Brown does not know whether his sister called maintenance.  *Id.*, Ex. 2 (James Brown, Jr. Dep. 66:9 - 67:7).  Although the maintenance office never responded to Mr. Brown's request, Plaintiff claims, in addition to Mr. Brown's call, Southern Management was on notice, at least constructively, through the monthly inspections of the exterior of the building inspections by the maintenance staff "to see if there are screens in the windows, gutters, downspouts."  Pl.'s Mem., Ex. 6 (Wilson Dep. 71:10 - 12).  Plaintiff notes Southern Management failed to abide by its maintenance guarantee to residents by responding to Mr. Brown's maintenance service request within 24 hours.  *See id.*, Ex. 5.  Moreover, Plaintiff observes, "[p]resuming that Defendant's maintenance personnel knew the air conditioning was broken[,] it is logical to assume that residents would have their window[s] open and that it would be even more important to ensure proper installation of the window screens."  *Id.* at 5.

Mr. Brown asserts he reported to maintenance the problem with the window screen.

---

[10] Q:  Who within the household would call to report maintenance issues?
A:  Either me or my sister.
Q:  Okay.  Why would you or your sister call?
A:  Because my sister's name is on the lease, but if she couldn't do it, I would do it because of any issues, any things that needed to be taken care of I could do it.

*Id.*, Ex. 2 (James Brown, Jr. Dep. 60:5 - 13).  Mrs. Brown testified that she also reported problems to maintenance by identifying herself as Tawanda Gray.  *See id.*, Ex. 3 (Jennifer Brown Dep. 17:5 - 18:1, 39:3 - 40:12).

Southern Management suggests this assertion is unreliable because Mr. Brown does not recall the date or time he called maintenance, the name of the maintenance technician or the maintenance telephone number.  Further, Mr. Brown admits he did not call maintenance a second time to report a problem with the window screen.  Def.'s Mem., at 6.  In determining whether the moving party has shown there are no genuine issues of any material fact, this Court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Tinsely v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).  Any disputed facts between Plaintiff and Defendant will be viewed in the light most favorable to Plaintiff and all inferences will be drawn in Plaintiff's favor.

Having received notice about the window screen a week and a half before Davhon's accident, was Southern Management's non-response a breach of a duty owed to Davhon?  Under Maryland law, a landlord may be held liable if the landlord and tenant signed a contract agreeing that the landlord shall repair any defective conditions.  Mr. and Mrs. Brown did not sign a lease with Southern Management.  As previously noted, Davhon Brown is listed as one of the occupants of the lease his aunt signed.  Although a copy of that lease has not been submitted as evidence, for purposes of this summary judgment motion, the Court infers such an agreement existed between Southern Management and its tenants.  In accordance with its maintenance guarantee, Southern Management should have sent a service technician to the apartment within 24 hours of Mr. Brown's request.  Even if Southern Management had not responded within 24 hours, a week and a half notice is sufficient time to cure the "defect."

Presuming Southern Management breached its contractual obligation to repair the "defect," Plaintiff's claim nonetheless fails on the third element, causation.  The problem

13

reported to maintenance was a window screen that was slightly or partially off track.  It is

undisputed the condition of the window was altered the night of Davhon's accident.

> Q:  [D]id the fan encompass the open area of the window as well as
> a part of the closed area?
>
> A:  Correct.
>
> Q:  Okay.  So that normally speaking, on any given day, your fan
> would have been in the window that Dav[h]on went out and it would
> have been blocking the open portion of the window?
>
> A:  Yes.

Pl.'s Mem., Ex. 2 (James Brown, Jr. Dep. 30:11 - 19).

According to Mrs. Brown, the fan was kept in the window to keep the children from

possible harm.

> Q:  Why wouldn't you open the window next to the fan?
>
> A:  Why wouldn't I?  Because my kids.
>
> Q:  What about them?
>
> A:  Because my kids, just to keep them safe.
>
> Q:  So you knew as of the day of this accident that there was a
> possibility that your children could get up on the bed and go out the
> window if the window was totally open; correct?
>
> *       *       *
>
> A:  Yes, if, but I had the fan there.
>
> Q:  So you kept the fan blocking the window so your children
> wouldn't get close to the window?
>
> A:  Yes.
>
> Q:  And then you only opened the window four inches so that the
> children wouldn't get out; correct?

14

       A:  Yes.

*Id.*, Ex. 3 (Jennifer Brown Dep. 30:15 - 31:2, 6 - 14).

       It is further undisputed, on the day of Davhon's accident, Mrs. Brown moved the fan from the window in the bedroom to the living room, leaving the window open.

       Q:  And so that the boys had been in the bedroom in the afternoon of the accident; correct?

       A:  Yes.

       Q:  And was the window opened or closed?

       A:  Opened.

       Q:  How far was it open?

       A:  Almost all the way.

       Q:  Who opened the window almost all the way in the afternoon of the accident?

       A:  Me.

       Q:  And why did you open it almost all the way?

       A:  To see if I could get some air.

       Q:  Okay.  Did you move the fan back in or did you leave it in the living room?

       A:  I left it in the living room.

*Id.*, Ex. 3 (Jennifer Brown Dep. 47:1 - 15).

       The Browns had taken affirmative steps to protect their children from potential harm by preventing the children from getting too close to the windows.

       Q:  So that as of July 21, '05, you thought that if you didn't take steps to protect the window, your children could be at risk of injury; correct?

MR. ROYER:   Objection.   You can answer it.

THE WITNESS:   Yes.

Q:   So you took appropriate steps so that they couldn't get near the window in their own bedroom; correct?

A:   Correct.

*Id.*, Ex. 2 (James Brown, Jr. Dep. 26:17 - 27:6).   Before this exchange, Mr. Brown described how he placed the children's dresser in front of one of the windows.   Later Mr. Brown testified, as a precaution to keep his children from falling through a window, he would either lock the window or keep the door to the master bedroom closed.   *Id.*, Ex. 2 (James Brown, Jr. Dep. 48:7 - 49:2; 49:21 - 50:7).

The Browns' queen size bed was very close to the window.[11]   Davhon and Darius were playing initially in their bedroom and then moved to their parents' bedroom.   No one knows how Davhon fell out of the window.

Q:   Have you ever asked [Darius] how this accident happened?

A:   I have.

Q:   And what did he tell you?

A:   He didn't say nothing.

*          *          *

Q:   When did you ask him what happened?

A:   After it happened.

Q:   That day?

---

[11] According to Mr. Brown, the queen size bed was positioned against the wall.   "There was a window next to [the bed] and then there is a window on the ledge.   No matter where you positioned the bed at in the room, there was still a window close by."   Pl.'s Mem., Ex. 2 (James Brown, Jr. Dep. 19:21 - 20:3).

A:   That day.

Q:   What did you ask him and what did he say?

A:   I said, "What happened?"

Q:   What did he say?

A:   Nothing.

Q:   Has he ever told you what happened?

A:   No.

Q:   Has anybody told you that they saw what happened?

A:   Has anybody told me?  No.

Q:   Okay.  Do you know Maurice Graves?

A:   Yes.

Q:   Did Mr. Graves ever tell you he saw what happened?

A:   Did he ever say what happened?  He just said that he saw him fall.  That's it.

Q:   He said – –

A:   He said that he saw him fall.  He saw him past the window.

Q:   Okay.

A:   While he was looking out the window.

Q:   Did Maurice Graves ever say that he actually saw your son come out of the window?

A:   No.

Q:   He told you that he first saw him in the air?

A:   Yes.

\*       \*       \*

Q:  So Maurice Graves told you he didn't see how your son got out; correct?

\*       \*       \*

Q:  Is it [sic] that a correct statement?

A:  Yes.

Q:  Has anybody ever told you that they saw how Dav[h]on got out the window?

A:  No.

Q:  And you don't know how he got out the window?

A:  No.

Q:   You don't know whether he pushed the screen out or not, do you?

A:  No.

\*       \*       \*

Q:  You don't know whether he bounced out?

A:  No.

Q:  Do you know whether [Darius] pushed him out?

MR. ROYER:  Objection.

THE WITNESS:  No.

*Id.*, Ex. 3 (Jennifer Brown Dep. 50:19 - 51:2, 51:8 - 52:16, 53:2 - 3, 53:6 - 16, 53:19 - 54:2).

Mrs. Brown admits the following:

Q:   [I]sn't it true that your bed in your master bedroom, in fact, sat right under the window that Dav[h]on went out on the day of the accident.

A:  Yes.

\*       \*       \*

Q:    [Y]ou never closed the door to your bedroom to keep the children from getting close to the open window, did you?

A:  No.

\*       \*       \*

Q:   And did the window remain almost all the way open from the time that you got up from your nap up until the time that Dav[h]on had his injury?

A:  Yes.

*Id.*, Ex. 3 (Jennifer Brown Dep. 24:11 - 15, 48:18 - 21, 49:10 - 13).

> Proximate cause ultimately involves a conclusion that someone will be held legally responsible for the consequences of an act or omission.  This determination is subject to considerations of fairness or social policy as well as mere causation.  Thus, although an injury might not have occurred "but for" an antecedent act of the defendant, liability may not be imposed if for example the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury[,] or if the injury is so remote in time and space from defendant's original negligence that another's negligence intervenes.

*Peterson v. Underwood*, 258 Md. 9, 16, 264 A.2d 851, 855 (1970) (citation omitted).

The Court finds the proximate cause of Davhon's accident was *not* any action or omission by Southern Management.  *See Pineda*, 72 Cal. Rptr. 2d at 208 (in this comparative negligence jurisdiction finding "the predominant cause of plaintiff's accident was careless parental placement of a bed under the window, followed by parental negligence in leaving the five-and-a-half-year-old plaintiff unattended and unsupervised.").  "If the law does not require landlords to provide screens that can support the weight of a child, there is no logical reason why

it should matter that the screen was loose, or otherwise defective." *Hussein*, 1999 Mich. App.

LEXIS 925, at *4.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court finds there are no genuine issues as to any material

fact and thus Defendant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56( c).

An Order will be entered separately.


September 25, 2007                                                  /s/
_____                     _____
           Date                                              WILLIAM CONNELLY
                                                    UNITED STATES MAGISTRATE JUDGE

20